UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PHILBERT COLE,<br><br>Defendant. | Case No. 2:15-cr-0090-KJD-PAL<br><br>ORDER |

Presently before the Court is Defendant's Motion for Compassionate Release from Incarceration (#58). The Government filed a response in opposition (#62) to which Defendant replied (#66). Defendant filed a Supplement (#67) to the motion.

I. Background

On May 20, 2015, Defendant Cole pled guilty to one count of conspiracy to interfere with commerce by robbery, three counts of aiding and abetting interference with commerce by robbery and a single count of brandishing a firearm in furtherance of a crime of violence. Essentially, Cole participated in a string of jewelry store robberies, from casing the stores in advance of the robberies to brandishing a handgun at employees and forcing customers to the floor during the robbery and fleeing with $1.1 million dollars worth of jewelry after the robbery.

On October 4, 2016, he was sentenced. Due to the Government's acknowledgment of his assistance against a co-conspirator, who was the motivating force behind the jewelry store robberies, Defendant received a 110-month sentence rather than the low-end guideline range of 162 months.

It is undisputed that Defendant Cole has suffered from mental illness his entire life, particularly bipolar depression. Defendant asserts that he is not receiving adequate mental health treatment in Bureau of Prison's custody. He asserts this as grounds for his compassionate relief.

He also asserts that his mental health history and hepatitis C require his release to protect him from COVID-19. At the time of the filing of the motion, he was incarcerated at FCI Beckley. He is presently housed at FCI Schuylkill, which currently reports seven (7) inmate and fourteen (14) staff member cases of COVID-19.[1]

II. Standard

The district court that imposed sentence on a criminal defendant has authority to modify the term of imprisonment under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018). That statute provides, in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that […]extraordinary and compelling reasons warrant such a reduction […] and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. §§ 3582(c)(1)(A), 3582(c)(1)(A)(i).

If the defendant has exhausted administrative remedies, the analysis is twofold.[2] First, the Court must consider the same factors applicable at the original sentencing, enumerated in 18 U.S.C. § 3553(a), to the extent they remain applicable at the time the motion is brought. 18 U.S.C. § 3582(c)(1)(A). Second, the Court must find "extraordinary and compelling reasons" to release a defendant from Bureau of Prisons ("BOP") custody in a policy statement. Id.

///

---

[1] See Bureau of Prisons (BOP), COVID-19 Cases (updated daily) (last accessed January 28, 2021).

[2] While there is some dispute about exhaustion, there is no doubt that on April 29, 2020, Defendant filed a formal request for compassionate release from the warden at FCI Beckley. More than thirty (30) days have passed without a response. Therefore, Defendant has satisfied the statutory requirement.

III. Analysis

The Court must first consider the same factors applicable at the original sentencing, enumerated in 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense, the need for the sentence imposed, the kinds of sentences available and sentencing ranges established in the guidelines, pertinent policy statements, the need to avoid unwarranted sentence disparities, and the need to provide restitution. 18 U.S.C. § 3553(a). The Court considered these factors on the day of sentencing and finds that they warrant the sentence as it stands today.

It also considers the Sentencing Guidelines policy statement that before reducing a term of imprisonment that "defendant is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)[.]" Defendant has not met his burden to show he is not a danger to the community. In considering dangerousness, the Court is guided by the sentencing factor focused on "the need for the sentence imposed … to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

While the Court is cognizant of the diligence and willingness of Defendant's parents to secure and tend to Defendant's health on home confinement, his history shows the dangerous potential if Defendant does not stay medicated or suffers an imbalance in his mental health. Not only is he a danger to himself in those instances, but others. His underlying conviction shows the depth of the danger.

Further, Defendant argues that his prison infractions have come at times of imbalance. Defendant's evidence that his infractions occurred as a result of lack of mental health treatment are based on his mother's affidavit of events that she did not witness but were relayed to her by Defendant. However, the BOP medical records show that the main incident in question was as a result of Defendant smoking "K2", a synthetic cannabinoid, a fact which he volunteered to prison medical staff.

Second, the Court does not find "extraordinary and compelling reasons" requiring the Court to release Defendant from Bureau of Prisons custody. Defendant's first argument is that he is not receiving adequate mental health treatment in custody. However, a complete reading of the

1  medical records reveal that Defendant does receive treatment, admittedly treatment that varies
2  from Defendant's ideal based on the fact of his incarceration. However, there is no evidence of
3  neglect in the record.
4    Further, Defendant complicates his treatment by refusing medical labs which are
5  necessary to monitor the effect and buildup of different medications in his system, particularly
6  Depakote or divalproex. The record shows that Defendant's requests to meet with Psychology
7  Services are approved. He is monitored by psychologists and doctors. He is prescribed
8  medication which he admits that he is not fully compliant with taking. Clearly, his needs are
9  being met. Finally, while the Court recognizes that Defendant provides evidence that mental
10 illness increases his risk of serious illness, it does not appear on the CDC's list of conditions that
11 place a person at increased risk. See PEOPLE WITH CERTAIN MEDICAL CONDITIONS,
12 https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-
13 conditions.html# (las visited Jan. 28 2021) (explaining which preexisting conditions place
14 individuals at additional risk of COVID-19).
15   Defendant also argues that he has chronic hepatitis C. However, the records only show
16 that he has been tested positive twice for hepatitis C. As a result of the second test at FCI
17 Allenwood, health services ordered HCV viral load and genotype testing. However, the viral
18 load was undetectable. With no other symptoms, the Court cannot find a basis for concluding
19 that Defendant has chronic hepatitis C.
20   The Centers for Disease Control and Prevention ("CDC") has "no information about
21 whether people with hepatitis B or C are at increased risk of getting COVID-19 or having severe
22 COVID-19." WHAT TO KNOW ABOUT LIVER DISEASE AND COVID-19,
23 https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last
24 visited Jan. 22, 2021).  Another doctor states that "[i]f somebody has hepatitis C with end-stage
25 liver disease, they *could* be more at risk of having a bad reaction to" COVID-19, but if
26 somebody "has good liver function and is asymptomatic for hepatitis C, then at this point we
27 don't know that there should be anything different from those who do not have hepatitis C
28 infection." WHAT PEOPLE LIVING WITH HEPATITIS C NEED TO KNOW ABOUT COVID-19,

https://newsnetwork.mayoclinic.org/discussion/what-people-living-with-hepatitis-c-need-to-know-about-covid-19/ (last visited Jan. 22, 2021). While Defendant should pursue further testing through the health services clinic[3], there are no "extraordinary and compelling reasons" to release him. Therefore, the Court denies his motion for compassionate release.

IV. Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Compassionate Release from Incarceration (#58) is **DENIED**.

Dated this 29th day of January 2021.

_____
Kent J. Dawson
United States District Judge

---

[3] It appears that Defendant's treatment to date complies with the Bureau of Prison's clinical guidance on treating hepatitis C: "Undetectable levels of HCV RNA indicate resolved infection or a false positive HCV Ab test. Such cases do not require ongoing follow-up or monitoring of this condition in a chronic care clinic." Bureau of Prisons, EVALUATION AND MANAGEMENT OF CHRONIC HEPATITIS C VIRUS (HCV) INFECTION, January 2018, *9, https://www.hepatitis.va.gov/hcv/screening-diagnosis/laboratory-tests.asp (last visited January 28, 2021).